UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **LEAH CROSS**, <br><br> Plaintiff, <br><br> v. <br><br> **U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, et al.,** <br><br> Defendants. | Case No. 1:25-cv-3702 (TNM) |

### MEMORANDUM OPINION

Leah Cross worked as an Amazon delivery driver until the company fired her for failing to meet delivery quotas. Cross claims that her termination was sexist. Amazon imposed delivery requirements so onerous that she could take bathroom breaks only by falling short on those requirements. Male drivers, meanwhile, could find relief without deviating from the route to seek out facilities.

That disparity prompted Cross to act. She filed a discrimination claim with the Colorado Civil Rights Division ("Colorado Division") which transferred her claim to the Equal Employment Opportunity Commission ("Commission"). She asserted that Amazon's policy had a disparate impact on women and thus violated Title VII of the 1964 Civil Rights Act. The Commission investigated her claim for two years.

In spring 2025, however, the President issued an executive order instructing agencies to deprioritize disparate-impact discrimination claims. A Commission memorandum implementing the order told staff to close disparate-impact claims. That included Cross's. She soon learned that the Commission closed its investigation of her claims, and she received a right-to-sue letter.

Cross turned here.  She argues that the Commission's memo violated the Administrative Procedure Act ("APA") in several respects, *see* Compl. ¶¶ 79–97; 5 U.S.C. § 706(2), and she seeks a preliminary injunction ordering a host of relief including the reopening of her investigation.  *See* Proposed Order at 1–2, ECF No. 2-6.

The trouble for Cross is that she failed to establish standing to bring these claims.  More specifically, she has not shown she suffered a judicially cognizable injury from the Commission's allegedly unlawful closure of her investigation.  And even if that were the kind of injury capable of judicial resolution, Cross has not shown that a favorable ruling by this Court would redress that injury.  Accordingly, the Court will dismiss her claims for lack of subject matter jurisdiction without addressing their merits.

## I.

Congress created the Equal Employment Opportunity Commission through Title VII of the 1964 Civil Rights Act.  *See* Pub. L. No. 88-352, § 705, 78 Stat. 241, 258 (1964).  That statute grants the Commission the authority to receive discrimination charges from private employees.  Indeed, Title VII requires employees to first file a charge with the Commission before suing their employers for discrimination.  *See id.* § 706(e), 78 Stat. at 260.

Title VII shapes the Commission's process for handling discrimination charges.  After an employee files a charge, the Commission must serve notice on the employer within ten days.  *See* 42 U.S.C. § 2000e-5(e)(1), (b).  The statute then instructs that the Commission "shall make an investigation" of that charge.  *Id.* § 2000e-5(b).  If "after such investigation," the Commission concludes that "there is not reasonable cause to believe the charge is true, it shall dismiss the charge and promptly notify" the employee and employer.  *Id.*  If the Commission instead finds "reasonable cause" to believe the charge, it must first use "informal methods" of conciliation to

eliminate the discrimination practice.  *Id.*  If those efforts fail, the Commission may sue the employer directly.  *Id.* § 2000e-5(f)(1).

Regardless of the Commission's determination, it must issue the charging party a right-to-sue letter 180 days after the filing of his charge.  *See id.*  The charging party has 90 days upon receiving that notice to sue the employer.  *See id.*; *see generally Fort Bend Cnty. v. Davis*, 587 U.S. 541, 544–45 (2019) (describing this process).  At that point, a court considers the discrimination allegations anew.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 799 (1973) (explaining that "court actions under Title VII are de novo proceedings and . . . a Commission 'no reasonable cause' finding does not bar a lawsuit in the case").

This case arises from that background.  Cross worked as an Amazon delivery driver for several months in 2022 before her termination for failure to meet delivery quotas.  Declaration of Valerie Collins ("Collins Decl.") at 1, ECF No. 2-4;  Declaration of Leah Cross ("Cross Decl.") ¶ 2, ECF No. 2-2.  As alleged in Cross's Complaint, Amazon held drivers like her to delivery goals so high that they lacked time for bathroom breaks.  Collins Decl. ¶ 3.  As a result, male drivers resorted to using bottles as a substitute for restrooms to avoid straying from delivery routes.  Cross Decl. ¶ 4.  That practice became so common that Cross often discovered urine-filled bottles in delivery areas or inside vans.  *Id.*  As a woman, Cross found bottles to be an impractical option.  Collins Decl. ¶ 3; Cross Decl. ¶¶ 5–6.  Cross claims that the difference hindered female drivers' ability to stay employed as Amazon delivery drivers.  Collins Decl. ¶¶ 2–3.

So in May 2023, Cross filed a sex discrimination complaint against Amazon with the Colorado Civil Rights Division ("Colorado Division").  Collins Decl. ¶ 1–2.  She claimed violations of both Title VII and Colorado law.  Specifically, she asserted that Amazon's delivery

quotas and resulting bathroom limitations had a disparate impact on female employees. *Id.* ¶¶ 2–3.

The Colorado Division transferred Cross's charge to the Commission's Denver office in January 2024. *Id.* ¶ 6. During its investigation, the Commission received a statement from Amazon and interviewed Cross in early 2025. *Id.* ¶¶ 6–7.

But April 2025 brought changes to the Commission's priorities and thus Cross's investigation. That month, President Trump issued Executive Order 14281, entitled "Restoring Equality of Opportunity and Meritocracy." 90 Fed. Reg. 17,537 (Apr. 28, 2025). That order instructed federal agencies to "deprioritize the enforcement of all statutes and regulations to the extent they include disparate-impact liability." *Id.* at 17,538. As for ongoing cases, the order told the Commission and Attorney General to "assess all pending investigations, civil suits, or positions taken in ongoing matters under every Federal civil rights law within their respective jurisdictions, including Title VII of the Civil Rights Act of 1964, that rely on a theory of disparate-impact liability, and [to] take appropriate action with respect to such matters consistent with the policy of this order." *Id.* The order provided that the Commission's actions "shall be implemented consistent with applicable law." *Id.* at 17,539.

The Commission's responses to the Executive Order prompted this lawsuit. In September 2025, the Commission issued a memo requiring staff to close all disparate-impact charges by month's end. Commission Memorandum ("Memo") at 2, ECF No. 2-3. That included Cross's claims. She received a notice from the Commission that "[t]he investigation of [her] charge ha[d] concluded" and that her charge would be "administratively closed." Collins Decl. at 31, Ex. E. The notice explained that if she wished to "pursue [her] claims further," she "must file a lawsuit within 90-days of [her] receipt of EEOC's official notice of dismissal." *Id.*

4

Meanwhile, Cross maintained that the Commission had "prematurely end[ed]" the investigation. Collins Decl. at 29, Ex. D.[1]

Cross turned to this Court. She filed a complaint alleging that she "has been denied the benefit of a full investigation" by the Commission. Compl. ¶ 75, ECF No. 1. She brings four claims under § 706(2) of the APA. First, she contends that the Commission acted contrary to Title VII and the Age Discrimination in Employment Act ("ADEA") by "selectively exclud[ing] categories of discrimination from the charge-investigation process." *Id.* ¶¶ 79, 81; 5 U.S.C. § 706(2)(A). Second, she argues that the Commission acted arbitrarily and capriciously through its abrupt change in policy. Compl. ¶ 86; 5 U.S.C. § 706(2)(C). Third, Cross asserts that the Commission's memo constitutes a substantive rule that is "in excess of statutory jurisdiction, authority, or limitations." Compl. ¶ 93; 5 U.S.C. § 706(2)(C). And fourth, she claims that the Commission should have promulgated its memo through notice-and-comment rulemaking procedures. Compl. ¶ 97; 5 U.S.C. § 706(2)(D).

Cross then moved for a preliminary injunction and asks for sweeping relief. Mot. for Prelim. Inj., ECF No. 2. She wants a declaration that the memo is without force or effect, an injunction barring the commission from implementing the memo, and an order tolling her deadline for filing lawsuits in matters that the Commission closed under the memo. Proposed Order at 1–2. She also wants an order requiring the Commission to list all charges that the memo affected, to notify all those who filed such charges that they may ask the Commission to resume investigating, and to toll their deadlines as well. *Id.* The Commission opposes, raising a host of objections, including questioning her standing to sue at all.

---

[1] All page citations refer to the page numbers that the CM/ECF system generates.

## II.

A preliminary injunction is "an extraordinary and drastic remedy" that is "never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (cleaned up). The movant must surmount a high bar and establish four factors by "a clear showing": first, that she is likely to succeed on the merits; second, that she will likely suffer irreparable harm in the absence of injunctive relief; third, that the balance of equities favors granting the relief.; and fourth, that the public interest favors the injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22 (2008). Where, as here, the Government is the party opposing injunctive relief, the latter two factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The same factors for issuance of a preliminary injunction apply to the issuance of a stay under § 705 of the APA. *See Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985).

Before turning to the merits of a preliminary injunction, the Court must address what amounts to a "threshold question in every federal case"—whether the plaintiff has standing to sue. *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Article III permits the Court to decide only "Cases" and "Controversies." U.S. Const. art. III, § 2. That "irreducible constitutional minimum," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up), requires plaintiffs to have a "personal stake" in the outcome of a case, "in other words, standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).

This limitation "is built on separation-of-powers principles," as it "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). Standing, to put it differently, ensures a court acts within its "properly limited" role. *Warth*, 422 U.S. at 498.

To show standing, a plaintiff must establish that she "has suffered or likely will suffer an injury in fact"; "that the injury likely was caused or will be caused by the defendant"; and "that the injury likely would be redressed by the requested judicial relief." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024).  Courts do not dispense standing "in gross," so a plaintiff "must demonstrate standing for each claim [s]he seeks to press and for each form of relief that is sought." *Davis v. FEC*, 554 U.S. 724, 734 (2008) (cleaned up).

### III.

Plaintiffs must support each element of standing "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561.  At the preliminary injunction stage, that means a plaintiff must make a "clear showing" that he is "likely" to establish standing.  *See Winter*, 555 U.S. at 22 (emphasis omitted); *Murthy v. Missouri*, 603 U.S. 43, 58 (2024).  Cross fails under that standard.

### A.

Start with injury.  The Supreme Court has "stressed that the alleged injury must be legally and judicially cognizable." *Raines v. Byrd*, 521 U.S. 811, 819 (1997).  Cross's purported injury—what she describes as the Commission's "premature" closure of her investigation—is not.  Cross's Reply ("Reply") at 6–7, ECF No. 13.

A judicially cognizable injury "requires, among other things," that the "dispute is traditionally thought to be capable of resolution through the judicial process." *Id.* (cleaned up). Challenges to the Executive Branch's "arrest or prosecution policies" seldom qualify. *United States v. Texas*, 599 U.S. 670, 677 (2023).

The Supreme Court's recent *Texas* ruling explains why.  There, two States challenged the Department of Homeland Security's promulgation of new guidelines that prioritized arrests of

some illegal immigrants over others. *Id.* at 674. One governing statute stated that the Department "shall" arrest certain noncitizens, such as those who are removable because of a state criminal conviction. *Id.*; *see* 8 U.S.C. § 1226(c). Another provided that the Department "shall" arrest and detain certain noncitizens for 90 days after the final removal order's entry. *Texas*, 599 U.S. at 674; *see* 8 U.S.C. § 1231(a)(2). As the States saw matters, the governing statutes imposed a mandatory arrest obligation greater than what DHS's guidelines authorized. *Texas*, 599 U.S. at 674. The Department's failure to meet that obligation, the States argued, imposed costs on them. *Id.* So the States sued and asked "the Federal Judiciary to order the Department to alter its arrest policy so that the Department arrests *more* noncitizens." *Id.* at 676 (emphasis in original).

The Supreme Court declined. It underscored the lack of "precedent, history, or tradition of courts ordering the Executive Branch to change its arrests or prosecution policies" to facilitate "more arrests" or "more prosecutions." *Id.* at 677. That history was in keeping with the separation of powers, the Court reasoned. Asking the Executive to bring more arrests "run[s] up against the Executive's Article II authority to enforce federal law." *Id.* at 678. Indeed, "the choice of how to prioritize and how aggressively to pursue legal actions against defendants who violate the law falls within the discretion of the Executive Branch, not within the purview of private plaintiffs." *TransUnion*, 594 U.S. at 429. The realities of limited investigative resources and "ever-shifting" public welfare needs also militate for Executive Branch discretion in the enforcement of statutes. *Texas*, 599 U.S. at 680.

So too here. Cross asks the Court to order the Commission to pursue a certain investigative approach. She seeks more investigations of discrimination claims in general, which would result in a fuller investigation of her own charges against Amazon. *See* Proposed Order

¶¶ 1, 5.  But as *Texas* made clear, federal courts are "not the proper forum for resolving claims that the Executive branch" should "bring more" investigations and enforcement actions.  599 U.S. at 680.

This is true even if Cross suffered from Amazon's policies and so as a practical matter, had an interest in the Commission's pursuit of an enforcement action.  *Texas* confirmed as much in relying on *Linda R.S. v. Richard D.,* 410 U.S. 614 (1973); *see, e.g.*, *Texas*, 599 U.S. at 674.  There, the mother of an illegitimate child challenged a State's failure to prosecute her child's father for his failure to pay child support.  *Linda R.S.*, 410 U.S. at 614–15.  Even though the mother suffered injury from "the failure of her child's father to contribute support payments," she still lacked a "judicially cognizable interest in the prosecution" of the child's father.  *Id.* at 618–19.  In general, the Court explained, "a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution."  *Id.* at 619.  The mother, who had a stake in another's prosecution just as great as or greater than Cross's, was no exception.  *Linda*'s logic applied in *Texas*, and it applies here too.  Cross is not the object of a Commission enforcement action, so she lacks standing to challenge the agency's enforcement decisions, including what claims it investigates.

That makes sense given the large number of claims the Commission handles.  Just last year, the Commission received more than 88,000 charges.  EEOC, *Fiscal Year 2024 Annual Performance Report* 12 (Jan. 17, 2025).  Among that deluge, the Commission must decide "whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and, indeed, whether the agency has enough resources to undertake the action at all."  *See Heckler v. Chaney*, 470 U.S. 821, 831 (1985).

9

The judiciary is not only "unsuit[ed]" to such tasks, but it risks offending the separation of powers by engaging in them. *See id.* at 831–32 (describing the decision of whether to prosecute "as the special province of the Executive Branch"); *ICC v. Locomotive Eng'rs*, 482 U.S. 270, 283 (1987) ("[I]t is entirely clear that the refusal to prosecute cannot be the subject of judicial review."). This is true both for criminal and civil enforcement. *See Texas*, 599 U.S. at 679; *Heckler*, 470 U.S. at 831 ("This Court has recognized on several occasions over many years that an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion.").

Cross insists that *Texas* does not apply to her case. As Cross sees things, her challenge concerns investigatory decisions, not prosecutorial ones as in *Texas*. Reply at 10. That is a distinction without a difference. Because the decision to prosecute is generally "the byproduct of an investigation," "the investigation itself" is "treated as a discretionary function." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 199 (D.D.C. 2002); *see also Gray v. Bell*, 712 F.2d 490, 516 (D.C. Cir. 1983) (describing "investigatory conduct" as "inextricably tied to the decision to prosecute"). That is likely why Cross could not list "any case law" drawing this "investigation versus prosecution distinction" either in briefing or at oral argument. Hearing Tr. at 12:20–22. The Commission's investigatory decisions fall comfortably within *Texas*'s ambit.

Cross is on firmer footing relying on *OSG Bulk Ships, Inc. v. United States*, 132 F.3d 808 (D.C. Cir. 1998), for the notion that courts may review an agency's "general enforcement policy," but not a "single-shot enforcement decision." *Id.* at 811–12 (emphasis omitted); *see* Reply at 5–6. Indeed, this distinction has mattered elsewhere, but it is not dispositive here. *Bulk Ships* concerned the Maritime Administration's interpretation of § 506 of the Merchant Marine Act of 1936. 132 F.3d at 811–12. The Merchant Marine Act sought to protect the American

shipping industry from foreign competition, yet the Maritime Administration interpreted § 506 to permit certain vessels that started as foreign-trade-only vessels to enter the domestic market. *Id.* at 809–11. A company that owned several domestic-trade oil tankers sued over that interpretation. *Id.* at 811. The Maritime Administration tried unsuccessfully to shield itself from review by characterizing the company's complaint as a challenge to its unreviewable "decision not to enforce the [§] 506 ban on domestic trade" by foreign-trade vessels. *Id.* at 812. The D.C. Circuit, however, saw the Maritime Administration's take on § 506 as a reviewable "general enforcement policy" and thus rejected the agency's argument before turning to the merits. *Id.* at 812 (emphasis omitted).

The authorities *Bulk Ships* cites clarify the basis for its conclusion. The Maritime Administration's policy at issue constituted a "direct interpretation[] of the commands of the substantive statute rather than the sort of mingled assessment[] of fact, policy, and law that drive an individual enforcement decision and that are . . . peculiarly within the agency's expertise and discretion." *Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671, 677 (D.C. Cir. 1994); *see Bulk Ships*, 132 F.3d at 811 (citing *Crowley*, 37 F.3d at 674–75). Indeed, *Bulk Ships* did not concern Maritime Administration decisions about allocating its limited resources or choosing among enforcement priorities. The case instead involved the Maritime Administration's view of what a governing statute permitted. 132 F.3d at 811. In other words, because the suit did not challenge "the manner in which the [agency] ha[d] chosen to exercise its enforcement discretion," but rather its "interpretation" of § 506, nothing shielded that question from judicial review. *Edison Elec. Inst. v. U.S. E.P.A.*, 996 F.2d 326, 333 (D.C. Cir. 1993); *see Bulk Ships*, 132 F.3d at 811 (citing *Edison Elec.*, 996 F.2d at 333).

11

This case is different.  Cross does not challenge a Commission policy that reflects its interpretation of Title VII's demands or other "substantive requirements of the law." *Edison Elec.*, 996 F.2d at 333.  Cross challenges the Commission's "discretionary judgment concerning the allocation of enforcement resources." *Id.*  That's all Cross could do based on the Commission's memo.  The memo did not interpret Title VII as foreclosing or permitting disparate impact claims as the Maritime Administration interpreted the Merchant Marine Act to allow domestic activities for certain vessels.  132 F.3d at 811–12.  It merely explained that the "Commission is not commencing, developing, or continuing to pursue litigation advancing disparate impact causes of action."  Memo at 2.  This discretionary prosecutorial decision-making was not at issue in *Bulk Ships*.

In any case, *Texas*, a more recent case from a higher court, involved a challenge to the kind of general non-enforcement policy that Cross argues *Bulk Ships* excepted.  And even before *Texas*, the Supreme Court had explained that its "prior decisions consistently hold that a citizen lacks standing to contest *the policies* of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution."  *Linda R.S.*, 410 U.S. at 619 (emphasis added).

Since *Texas*, too, the D.C. Circuit has rejected challenges to agency "enforcement policies and priorities" for lack of standing because of "the basic rule that private persons . . . have no judicially cognizable interest in procuring enforcement of the . . . laws against third parties."  *Johnson v. Becerra*, 111 F.4th 1237, 1245 (D.C. Cir. 2024) (citing *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 897 (1984)) (cleaned up); *see id.* (rejecting plaintiffs' request for "an injunction directing the [HHS] Secretary to . . . meaningfully enforce the conditions" for home health services "to participate in Medicare" for lack of standing) (cleaned up).  *Bulk Ships* cannot save Cross's complaint from *Texas*'s bar on judicial review of prosecutorial priorities.

12

Cross also theorizes that her request for an order directing the Commission to keep investigating poses no risk to its discretionary functions because her case ended in an "administrative closure," not a "no cause finding." Reply at 10–11. But how Cross's investigation ended, even if by error on the Commission's part, does not inform whether she has standing to sue the Commission over that decision. Not any plaintiff can sue to remedy any wrong: The Constitution did not "set up something in the nature of an Athenian democracy or a New England town meeting to oversee the conduct of the National Government by means of lawsuits in federal courts." *All. for Hippocratic Med.*, 602 U.S. at 396 (quoting *United States v. Richardson*, 418 U.S. 166, 179 (1974)). Agency enforcement discretion applies across the board, not just when courts agree with agency decisions. Again, standing doctrine binds the Court's hands. Accepting Cross's "Executive-Branch under-enforcement" challenge would open the doors to a lawsuit that "federal courts have not traditionally entertained." *Texas*, 599 U.S. at 681. The Court declines to innovate.

Cross also asserts that statutory language makes the investigation of disparate-impact claims "mandatory." Mot. for Prelim. Inj. at 24. To be sure, Title VII states that the Commission "shall" make an investigation. 42 U.S.C. § 2000e-5(b). But the same was true of the governing statute in *Texas*, and that did not change the standing calculus. *See* 599 U.S. at 674. Rather, given the "deep-rooted nature of law enforcement discretion," *id.* at 682 (cleaned up), the use of "shall" in a statute "is not sufficient" to displace the Commission's traditional enforcement discretion, *Sierra Club v. Jackson*, 648 F.3d 848, 856 (D.C. Cir. 2011). Laws granting government actors authority often "use the word 'shall' to authorize, but not to require . . . action." *De Martinez v. Lamagno*, 515 U.S. 417, 432 n.9 (1995) (pointing to examples in the Federal Rules); *see also Town of Castle Rock v. Gonzales*, 545 U.S. 748, 761

13

(2005) (holding that statutory language that police officers "shall use every reasonable means to enforce a restraining order" did not displace traditional enforcement discretion (cleaned up)); Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 113 (2012) ("*Shall*, in short, is a semantic mess. *Black's Law Dictionary* records five meanings for the word.").

So when it comes to statutory directives to an agency, "shall" may not be mandatory. But even when it is, courts have been reluctant to enforce such a requirement. The Court thus would need a "stronger indication from Congress that judicial review of enforcement discretion is appropriate," before finding that an investigatory "mandate" from Congress "entitle[s] any particular plaintiff to enforce that mandate in federal court." *Texas*, 599 U.S. at 682 (cleaned up). So even if Cross is right that Congress required the Commission to investigate all complaints, the Commission's failure to do so is not a cognizable injury to her.

Cross also cites stray language from various Title VII cases, but none concerns Article III standing, and none establishes a mandatory duty to investigate in any event. Take *Occidental Life Insurance Co. of California v. EEOC*, 432 U.S. 355 (1977). That case concerned whether the Commission had a time limitation to sue an employer. *Id.* at 357–58. *Occidental* said nothing about the extent of the Commission's general investigatory obligations to employees filing claims, much less whether plaintiffs may sue the Commission over its failure to meet those investigatory obligations. The language Cross cites noting that the Commission is "required to investigate [a] charge and determine whether there is reasonable cause to believe that it is true" comes from *Occidental*'s summary of Title VII's mechanics. *Id.* at 359. A cursory explanation in a case's background facts section does not establish a mandatory duty to investigate that courts can enforce in defiance of *Texas*'s teaching.

14

Cross's other cases suffer from the same flaws. In *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015), the Supreme Court held that the Commission had a "duty" to attempt conciliation before suing an employer. *Id.* at 486. Like *Occidental*, *Mach Mining* involved the Commission's obligations toward *employers* it investigated, not *employees* filing charges. *Id.* at 486–87. *Mach Mining* addressed what the Commission must do to meet Title VII's requirement that it "endeavor" to use "informal methods" including "conciliation" to eliminate discriminatory practices before suing an employer. *Id.* at 486; 42 U.S.C. § 2000e–5(b). That case involved neither a question about standing nor a question about the Commission's investigatory obligations to complainants. It thus says little about this case.

So too for *Martini v. Federal National Mortgage Association*, 178 F.3d 1336 (D.C. Cir. 1999). *Martini* addressed whether the Commission may prematurely issue employees a right-to-sue letter. *Id.* at 1341, 1345. All the Circuit held was that the Commission must wait the 180 days that § 2000e–5(b) mentions before issuing a right-to-sue letter. *Id.* at 1347. Like *Mach Mining*, *Martini*'s superficial reference to the Commission's "mandatory" duty to investigate does not arm Cross with a judicially enforceable mandate. 178 F.3 at 1346.

Cross last tries a different spin on *Texas*. She maintains that the Commission fully abdicated its enforcement duties by singling out disparate-impact claims, so *Texas*'s standing limitations do not apply. Indeed, the *Texas* Court cautioned that, theoretically, "the standing calculus *might* change if the Executive Branch wholly abandoned its statutory responsibilities" to enforce the immigration laws. 599 U.S. at 682 (emphasis added).

But that is not what has happened here as to Title VII. The Commission still investigates discrimination charges, even some of those originally premised on disparate impact. The memo at issue, for instance, made clear that investigators who "previously solely commenced an

15

investigation based on disparate impact liability" could pursue that same investigation on a "disparate treatment liability" theory if the facts supported as much. Memo at 2. More, Cross already received a two-year investigation, hardly a "total abdication" of the Commission's responsibility. Whatever constitutes total abdication—and Cross cites no case involving such a finding—that is not it. To the extent total abdication exists as a speculative limiting principle, this is not the case for the Court to break new ground.[2]

### B.

Injury aside, redressability independently forecloses Cross's suit. As part of the standing calculus, "it must be likely, as opposed to merely speculative," that Cross's "injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (cleaned up).

Cross asks the Court to direct the Commission to reopen her investigation. *See* Proposed Order ¶ 5. "But then what?" Hearing Tr., at 46:11. The relief Cross seeks boils down to a request for further investigation. *See* Proposed Order ¶ 5. First, it is unclear what a sufficient investigation would look like, especially given the two years the Commission already spent investigating Cross's claims. *See* Compl. ¶¶ 66-75. Second, and to repeat, the "power to decide when to investigate, and when to prosecute, lies at the core of the Executive's duty to see to the faithful execution of the laws." *Cmty. for Creative Non-Violence v. Pierce*, 786 F.2d 1199, 1201 (D.C. Cir. 1986). That means "a judicial decree" requiring the Commission to resume Cross's

---

[2] Cross's claims anchored to the ADEA fail for the separate reason that she has not suffered from age discrimination. Cross alleged only sex discrimination under Title VII and Colorado state law. *See* Collins Decl. ¶ 3; Compl. ¶ 5. Without injury linked to the handling of an ADEA claim, she cannot mount an ADEA-related challenge. Cross invokes *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 n.5 (2006) in response to this point. But *DaimlerChrysler* rejected a party's attempt to challenge additional "governmental actions that did not injure him." *Id.* And the portion of *DaimlerChrysler* Cross cites refers to cases that accepted challenges to agency rules on ground unrelated to those plaintiffs' injuries based on the "public interest." *See Sierra Club*, 578 F.2d at 392. Cross does not make that argument, so those cases do not govern.

investigation would do "nothing to change the fact that" the Commission still "possess the same underlying" investigatory "discretion." *Texas*, 599 U.S. at 691 (Gorsuch, J., concurring). The Court thus could not require a certain depth, length, or outcome from the investigation. Upon the reopening of Cross's claim, the Commission could promptly dismiss them without explanation again, or it could produce the kind of well-reasoned decision that would better serve Cross's litigation goals. Guessing whether the Commission "might choose to exercise its enforcement discretion" in a certain way "requires speculation" beyond what standing doctrine permits. *Am. First Leg. Found. v. Greer*, 153 F.4th 1311, 1315 (D.C. Cir. 2025); *see Texas*, 599 U.S. at 704 (Barrett, J., concurring) ("The [plaintiff] failed to show that the District Court could order effective relief.").

The same is true for Cross's request for a vacatur of the Commission's memo. *See* Proposed Order ¶¶ 1-2. Vacating the memo would not cause the Commission to resume its investigation of Cross's charges, but it promises only prospective relief for future disparate impact charges. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) (holding that standing to seek injunctive relief based on a past harm requires a "real and immediate threat" that the harm will recur). And Cross has not suggested that she plans to bring more charges to the Commission that will be subject to its memo. *Id.* at 101–02.

What *would* remedy Cross's true injuries? A Title VII claim. As the D.C. Circuit has explained, "the remedy for any improper handling of a discrimination charge by" the Commission is an "aggrieved employee['s]" ability to bring "a Title VII action directly against his or her employer." *Smith v. Casellas*, 119 F.3d 33, 34 (D.C. Cir. 1997) (per curiam). That is why Cross has "no cause of action against the [Commission]" for "challenges to its processing of

17

a claim." *Id.* So while this Court cannot redress Cross's injuries, another may, should she further pursue her Title VII claim against her former employer.[3]

## IV.

In sum, Cross has failed to show that she suffered a cognizable legal injury that a favorable ruling by this Court would redress. Standing doctrine thus precludes further review. The case will therefore be dismissed for lack of subject matter jurisdiction. A separate Order will issue today.

Dated: November 25, 2025                                         TREVOR N. McFADDEN, U.S.D.J.

---

[3] The Court also declines to grant Cross's request to toll the filing deadline for her Title VII claim. *See* Proposed Order ¶ 3. Should she pursue her Title VII claim in court past her 90-day deadline, she may seek equitable tolling from that court. And because Cross lacks standing to challenge her own investigation, so do the countless, unnamed individuals Cross refers to in her motion. *See* Proposed Order ¶ 5 (requesting that the Court require the Commission to identify all individuals with claims affected by the Commission's memo, provide them notice, toll their filing deadlines, and allow them to request the Commission resume their investigations).